IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Yellow Transportation,               :
                    Petitioner       :
                                     :
          v.                         : No. 1227 C.D. 2015
                                     : Submitted: November 25, 2015
Workers' Compensation Appeal         :
Board (Shatkoff),                    :
                    Respondent       :


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge[1]
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
PRESIDENT JUDGE PELLEGRINI                    FILED: January 5, 2016


          Yellow Transportation (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) granting Wayne Shatkoff's (Claimant) claim petition for disability benefits as well as denying Employer's petition to terminate benefits under the Pennsylvania Workers' Compensation Act (Act)[2] because Claimant has not yet made a full recovery from his workplace accident. We affirm.

---

[1] This matter was assigned to this panel before January 1, 2016, when President Judge Pellegrini assumed the status of senior judge.

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4, 2501-2708.

**I.**

On February 23, 2012, Claimant, who was employed by Employer as a dock worker, fell backwards while pulling freight and allegedly injured his left elbow, lower back, right hip, left knee and left foot. In March 2012, Claimant filed a claim petition[3] seeking disability benefits and the payment of his medical bills and attorneys' fees alleging that the aforementioned injuries were the result of the accident that he sustained in the course of his employment with Employer. He later amended the petition to allege that he also sustained a left shoulder injury as a result of the February 2012 accident.

**II.**

**A.**

Before the WCJ, Claimant testified that his responsibilities as a dock worker included loading and unloading trucks and transferring merchandise to other trailers or to the dock, depending on instructions from a supervisor. He stated that he normally lifted up to about 100 pounds or so depending on whether there was anyone to help him lift, whether equipment was available, and the size of the merchandise to be unloaded. While unloading a trailer, he testified that he fell backwards, landing on his elbow and twisting his whole body, and that no one witnessed him going backwards and falling.

---

[3] In a claim petition proceeding, a claimant bears the burden of proving all of the elements necessary to support the award of compensation benefits, including establishing a causal relationship between the claimant's injury and his disability. *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 634 A.2d 592, 595 (Pa. Cmwlth. 1993).

Claimant then testified that he immediately reported his accident to his supervisor, Jonathan Hadix (Hadix). He testified that Hadix offered to take him to receive medical care, but that he declined the offer as he had left his wallet at home and needed to get it before he went to the hospital. He stated that after he left work, he went to Magee-Womens Hospital of UPMC (Magee), where he complained of problems with his elbow, back, knee and essentially his whole body because it "felt like somebody ran [him] over." (Reproduced Record (R.R.) at 213a.) He explained that he received x-rays at Magee and was instructed to make an appointment with his primary care physician.

Claimant further testified that he saw his primary care physician, Dr. Richard Rydze (Dr. Rydze) a few days later and Dr. Rydze instructed him to have a CAT scan for his right hip and to follow up with Dr. Stephen Conti (Dr. Conti), the other doctor who was treating him. Claimant stated that Dr. Conti had previously treated him for foot problems, and when he went to see him after the February 2012 accident, Dr. Conti injected his ankle and put him in a boot. Claimant stated that he saw Dr. Conti again about a month after the first visit and Dr. Conti injected his ankle again. Claimant testified to seeing Dr. Robin West (Dr. West), who referred him to Dr. David Stone (Dr. Stone), who provided physical therapy for Claimant's hip and back twice a week. He also testified to seeing Dr. Glenn Buterbaugh (Dr. Buterbaugh), who performed a nerve conduction test and scheduled him for surgery on his left elbow.

Claimant testified that he had had problems with his left shoulder prior to his February 2012 injury because he had injured it roughly 30 years ago in the

3

course of employment with Employer which required rotator cuff surgery. He stated that his left shoulder was not bothering him in the few years prior to his current injury and that he had returned to his full duties as a dock worker. Claimant stated that he has not been back to work since the accident and although he has been cleared to work in a light-duty capacity, he does not feel able to go back to work due to the strength that his job requires and the fact that his doctor has placed a restriction on his lifting. He added that he has not received any benefits or sick pay since he has been off work.

Jonathan Hadix testified that Claimant reported his February 2012 injury to him and said that he was pulling freight in a trailer and "had twisted around and fallen down on his elbow and hurt his lower back." (R.R. at 234a.) Hadix stated that Claimant did not report injuries to any other body parts at the time, and his demeanor when reporting the injuries was casual. He testified that he did not notice Claimant exhibiting any signs of pain and Claimant did not request to seek any medical treatment prior to his break. Hadix testified that after Claimant reported his injury, he went down to investigate the trailer and discovered that the trailer was empty, which indicated that Claimant "would have continually worked the trailer, moving the rest of the freight after the alleged injury." (*Id.* at 238a.) Hadix explained that the order Claimant was working on contained four pieces of freight and he was injured moving the second piece; as such, for the job to have been completed, Claimant "would have had to pick up the other two pieces in the --- out of the trailer, put them on the forklift and move them into the outbound loading trailer and then load them into the outbound trailer." (*Id.* at 239a.) He stated that it is possible that another worker emptied the remaining pieces after Claimant's injury, but he is not sure as he did not

4

question the other workers about anything other than whether they witnessed the accident. Hadix also testified to checking the forklift blades that Claimant slipped on and found that there was nothing on them to make them slippery.

Hadix testified that after Claimant came back from his break, he was clutching his lower back with his left hand and insisted that he needed to go seek medical attention. Hadix elaborated that the reason that he remembered Claimant clutching his back with his left hand was because he and another employee, Bob Meyers, were writing up a report about the incident and "one of the things that stuck out… on [Claimant's] actual report he stated that he had fallen on his left elbow and he was clutching his back with his --- his left hand which would have been his injured elbow." (R.R. at 240a.) Hadix stated that he asked Claimant to reenact the injury, but he refused to do so, insisting instead that he needed to leave to receive care. Hadix testified that on the day following the injury, Employer provided disciplinary action to Claimant in the form of two warning letters, one was for improperly handling freight and the other was for failing to report the injury when it happened. Hadix also testified that Claimant completed the report of injury form prior to leaving to go seek medical treatment.

**B.**

In support of his claim petition, Claimant submitted the deposition of Dr. Rydze, a board certified internist practicing medicine for over 35 years who testified that he began treating Claimant in 1990 and has regularly seen him since then for various ailments. Dr. Rydze testified that due to a workplace injury sustained in December 1990, Claimant's diagnosis around October 2011 was that he had internal

derangement of his left knee with degenerative changes and a chronic left ankle injury with a subtalar fusion and has never fully recovered from that injury. Dr. Rydze testified that Claimant saw him on February 27, 2012 after his accident when he complained about 1) his left knee being more swollen and more painful than before; 2) discomfort in his left shoulder; 3) discomfort and swelling in his left elbow; and especially 4) discomfort in his right hip. Dr. Rydze testified that an examination showed:

> He had swelling of his -- he had more swelling of his left knee than usual. He had soft tissue swelling around the left elbow. He had -- he was complaining -- well, he was -- he had some, what we call, impingement findings on his left shoulder exam. He had a very tender hip, particularly, the under portion of the hip called the ischial area, and pain upon externally rotating his hip which I was concerned about.

> \* \* \*

> Examination of his lumbar area showed that he had some tenderness over the muscles in his lower back, but I think the thing that caught my eye was that -- I made a note about it here -- that he had almost a -- I made a note about some dextroscoliosis. There was some curvature in his lower back that was probably related to muscle spasm causing his back to look like it was a scoliosis. It was something that he had not had before. That is probably what it was, was [sic] spasm in the muscles of his back. So it was multiple areas; the left shoulder, the left elbow, left knee and right hip.

(R.R. at 91a-92a.)

6

Dr. Rydze testified that an EMG of Claimant's left upper extremity showed changes that would suggest a left sural sensory mononeuropathy and evidence of positive waves in an area in the lumbar paraspinal muscles, and that these were reproducible abnormal findings. He stated that a CAT scan of Claimant's ankle and a bone scan showed some radiotracer uptake in the lower lumbar spine, knees and the acromioclavicular joints, and some mild activity in the right mid-foot near the base of the third and fourth metatarsals. Dr. Rydze testified that Claimant's problems included tennis elbow on his left elbow; a left shoulder impingement; a disc space narrowing to his spine between L5-S1; a contusion of the hip; and a flare-up of his internal derangement of his left knee. He opined that the problems were related to the February 2012 accident as they were all new problems since that accident. Dr. Rydze testified that as of May 25, 2012, Claimant was cleared to do light-duty work by Dr. Buterbaugh after a surgical procedure on his elbow. He testified that the last date that he saw Claimant was April 26, 2012, when he was still having shoulder impingement; however, his hip contusion was getting better.

On cross-examination, Dr. Rydze testified that Claimant had two prior left knee surgeries, and it was possible that those surgeries contributed to the internal derangement and possibly degenerative changes to his knee. He also testified that Claimant had a prior left shoulder surgery at some point and that as recently as 2007, Claimant complained to him of left shoulder pain. He further stated that he could not recall any specific pre-injury complaints regarding Claimant's elbow, and that if Claimant had ulnar entrapment dating back to 1999, then he would continue to have an entrapped nerve and a nonfunctional hand. Dr. Rydze stated that Claimant

7

suffered a prior avulsion fracture of his right hip, explaining that such a fracture is caused by a tendon injury.

Claimant also offered the January 9, 2013 deposition testimony of Dr. Buterbaugh, a board certified orthopedic surgeon with a certification of added qualification in hand surgery. Dr. Buterbaugh testified that he began treating Claimant for his left elbow and left shoulder on March 26, 2012, and an examination conducted that day revealed crepitation and pain on range of motion testing on Claimant's left shoulder, weakness of the supraspinatus, hypersensitivity of the ulnar nerve in his left elbow, and numbness of the ring and little finger of his left hand on full extension. Dr. Buterbaugh testified that he then recommended that Claimant undergo nerve conduction studies and an EMG to further evaluate the ulnar nerve, and that the results of the study were consistent with ulnar nerve neuropathy of the left elbow, compression of the nerve and the beginning of muscle changes involving the left hand relating to the pinched nerve in his left elbow. Dr. Buterbaugh stated that as a result, he performed an ulnar nerve transposition on May 4, 2012. He stated that on June 11, 2012 Claimant returned for a follow-up and, although he was doing reasonably well, he was having increased symptoms in his left shoulder including pain and clicking on range of motion.

On cross-examination, Dr. Buterbaugh testified that after a month of physical therapy, Claimant continued to show improvement in his left elbow, but not his left shoulder, and Dr. Buterbaugh ordered a CT arthrogram, which revealed evidence of tears of the supraspinatus and infraspinatus tendons of the left shoulder with atrophic changes in the supraspinatus muscle. He explained that the

supraspinatus tear showed atrophic changes and that was something that would occur over a long period of time, whereas the infraspinatus muscle did not have atrophic changes and would have occurred over a shorter period of time. He opined that Claimant suffered "an injury that was an acute on chronic; one that was chronically torn most likely before his injury and then was aggravated and was further torn and injured at the time of the injury." (R.R. at 170a.)

Dr. Buterbaugh stated that he recommended arthroscopic surgery to repair the rotator cuff, and his findings during the procedure which took place on August 16, 2012, confirmed his prior opinions; however, Claimant had more arthritis in his shoulder joint than was seen on the CT scan. Dr. Buterbaugh also testified that he did not treat Claimant again for his elbow until November 7, 2012, and he ultimately opined that as a result of the February 2012 work incident, Claimant sustained a left ulnar nerve injury and an aggravation of a prior rotator cuff tear that caused progression of the tear ultimately requiring surgery to both the left elbow and left shoulder. Dr. Buterbaugh also opined that as of the date of the deposition, Claimant had not fully recovered from his elbow and left shoulder injuries and that he would not have been able to return to work for Employer as a dock worker. Lastly, Dr. Buterbaugh disclosed that he had not reviewed any medical records pre-dating his own and, as such, did not know whether or not Claimant had ulnar neuropathy before the work injury.

In support of its position, Employer offered two narrative reports by Dr. D. Kelly Agnew (Dr. Agnew), who first examined Claimant on April 25, 2012, at Employer's request. Upon physical examination, Dr. Agnew noted diminished left

shoulder range of motion which he attributed to an old injury with surgery. In conjunction with his examination, Dr. Agnew also reviewed Claimant's medical records, including pre-injury medical records, and found that "there is nothing to suggest that the ulnar neuropathy remained symptomatic just prior to the February 2012 event." (R.R. at 30a.) Rather, Dr. Agnew noted that the left elbow injury was the most significant injury related to Claimant's February 2012 accident and that his increased pain complaints were consistent with the mechanism of injury.

Dr. Agnew performed another physical exam on Claimant on May 8, 2013, and reviewed medical records from Dr. Buterbaugh that were not available to him at the time of his first examination. Based on his evaluation of the records, Dr. Agnew could no longer attribute Claimant's left shoulder and left elbow injuries to his February 2012 accident. Dr. Agnew opined that Claimant's past complaints indicate that he suffers from chronic injuries and do not at all indicate an acute injury. Regardless, Dr. Agnew found that the surgeries performed by Dr. Buterbaugh were reasonable and successful treatments for the injuries. Dr. Agnew concluded that Claimant has achieved function recovery from the surgeries and that he is capable of performing all of the activities that he was performing on the date of the accident.

## III.

In October 2013, the WCJ issued a decision granting Claimant's claim petition, finding that on February 23, 2012, in the course of his employment with Employer, Claimant sustained injuries to his left elbow and left shoulder, and a now resolved right hip contusion, causing him to be totally disabled from that date forward and continuing. In making her decision, the WCJ credited Claimant's testimony and

10

relied on it in making her findings.[4] The WCJ also found as credible the testimony of Dr. Rydze and Dr. Buterbaugh, finding their testimony consistent with Claimant's credible testimony as to the mechanism of injury and the objective findings in the evidence of record. She especially found significant that Dr. Buterbaugh had the advantage of his presence at surgery to aid in his understanding and that his opinion was explained by objective findings. The WCJ did not credit Dr. Agnew's testimony insofar as it differed from that of Dr. Rydze and Dr. Buterbaugh.

Employer appealed to the Board, arguing that the WCJ disregarded competent evidence of record when she failed to address Dr. Agnew's second narrative report. Employer argued that the WCJ erred in not addressing Claimant's pre-existing condition that he identified in his testimony, and that because Claimant's medical experts were unaware of his pre-existing condition and had an inaccurate history of the claim, their medical opinions were incompetent to support an award.

The Board affirmed the WCJ's decision, with the exception of the payment of a medical lien. The Board found that Claimant had met his burden of proof because the WCJ accepted his testimony and the testimony of his medical experts as to his work-related injuries and the resulting disability. The Board also noted that despite discrepancies in Dr. Rydze's testimony, answers given on cross-

---

[4] The WCJ noted that, "Mr. Hadix's testimony is not factually inconsistent with [Claimant's] testimony, but has apparently been offered in an attempt to make the [Claimant's] conduct appear somehow suspicious." (WCJ 10/16/13 Decision at 3.) With regard to Hadix's testimony, the WCJ concluded that "all it establishes is that Mr. Hadix does not like [Claimant], and is suspicious of him, and that the feeling is mutual. It gives me no reason to doubt [Claimant's] factual testimony under oath." (*Id.* at 4.)

examination do not, as a matter of law, destroy the effectiveness of a previously expressed opinion, and Dr. Rydze did not recant his opinion at any point. Moreover, the Board explained that the fact that a medical expert does not have all of a claimant's medical records goes to the weight to be accorded to the testimony and not its competency, and the Board did not find that the record clearly showed Dr. Rydze's and Dr. Buterbaugh's opinions were solely predicated upon inaccuracies so as to render them incompetent. The Board concluded that although the WCJ failed to address Dr. Agnew's second report, given the WCJ's findings and credibility determinations and that her decision was based upon "all of the evidence of record," it did not believe the WCJ's determination evidenced a capricious disregard of the evidence so as to warrant further action.

## IV.

## A.

In this appeal,[5] Employer argues that the WCJ arbitrarily and capriciously disregarded the competent evidence of record when she incorrectly summarized Dr. Agnew's opinions and disregarded his second narrative report. Specifically, Employer argues that during his first examination of Claimant, Dr.

---

[5] In a workers' compensation proceeding, this Court's scope of review is limited to determining whether there has been a violation of constitutional rights, errors of law committed or a violation of appeal board procedures, and whether necessary findings of fact are supported by substantial evidence. *Lehigh County Vo-Tech School v. Workmen's Compensation Appeal Board (Wolfe)*, 652 A.2d 797, 799 (Pa. Cmwlth. 1995). "Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion…. In performing a substantial evidence analysis, this [C]ourt must view the evidence in a light most favorable to the party who prevailed before the factfinder." *Waldameer Park, Inc. v. Workers' Compensation Appeal Board (Morrison)*, 819 A.2d 164, 168 (Pa. Cmwlth. 2003) (citation omitted).

12

Agnew did not have Dr. Buterbaugh's medical records in forming his opinion, and once he reviewed Dr. Buterbaugh's records, he changed his opinion, which the WCJ failed to consider.

It is well established that the WCJ, as the finder of fact, has the authority over questions of credibility, conflicting evidence and evidentiary weight. *Sherrod v. Workmen's Compensation Appeal Board (Thoroughgood, Inc.)*, 666 A.2d 383, 385 (Pa. Cmwlth. 1995). As a result, the WCJ is entitled to accept or reject the testimony of any medical witness in whole or in part. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck)*, 664 A.2d 703, 706 (Pa. Cmwlth. 1995). Moreover, the WCJ may choose to rely on one medical expert over another. *Morey v. Workmen's Compensation Appeal Board (Bethernergy Mines, Inc.)*, 684 A.2d 673, 678 (Pa. Cmwlth. 1996). A WCJ's credibility and evidentiary determinations are binding on appeal unless made arbitrarily and capriciously.[6] *Casne v. Workers' Compensation Appeal Board (STAT Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008).

Here, the WCJ credited the testimony of Claimant and Dr. Rydze and Dr. Buterbaugh because they align with one another and rejected the opinion of Dr. Agnew where it differed from the testimony of Dr. Rydze and Dr. Buterbaugh. "[G]reater credence may be given to the testimony of a treating physician than to a

---

[6] A capricious disregard of evidence exists when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result. *Casne v. Workers' Compensation Appeal Board (STAT Couriers, Inc.)*, 962 A.2d 14, 19 n.5 (Pa. Cmwlth. 2008) (citation omitted). The meaning of arbitrary includes "founded on prejudice or preference rather than on reason or fact." *Id.* (citation omitted).

physician who examines simply to testify for litigation purposes." *D.P. "Herk" Zimmerman, Jr., Inc. v. Workmen's Compensation Appeal Board (Himes)*, 519 A.2d 1077, 1080 (Pa. Cmwlth. 1987). The WCJ found significant that Dr. Buterbaugh had the advantage of his presence at Claimant's surgery to aid in his understanding of Claimant's injuries. Both of Claimant's medical experts credibly testified as to the injuries Claimant sustained due to the February 2012 accident, making sure to differentiate between the injuries sustained because of the accident from Claimant's problems prior to the accident.

Claimant, Dr. Rydze and Dr. Buterbaugh all testified that Claimant's injuries preclude him from returning to work as a dock worker for Employer due to the physical requirements of the job, whereas Dr. Agnew found Claimant to be able to perform such physical duties. Although the WCJ did not credit Dr. Agnew's reports or mention his second report, there is nothing in the record that suggests that she did not consider it in making her decision. Alternatively, the WCJ simply found Claimant and his medical witnesses' testimony more persuasive, which is well within her discretion.

**B.**

Employer next argues that the WCJ arbitrarily and capriciously disregarded the substantial evidence of record in failing to take Claimant's preexisting condition into consideration in making her decision. Specifically, Employer contends that the WCJ disregarded Claimant's left elbow and right hip conditions in making her determination, especially because she failed to credit Dr.

14

Agnew's second report which documented pre-injury conditions and instead credited Claimant's dishonest testimony and the history he provided to his medical experts.

After performing thorough examinations with multiple EMGs, both Dr. Rydze and Dr. Buterbaugh opined that Claimant's left elbow injury was related to his work accident and not a preexisting condition. Dr. Rydze has been treating Claimant since 1990 and specifically stated that he could not recall any pre-injury complaints regarding Claimant's elbow in his many years as Claimant's physician. Dr. Rydze further stated that had Claimant been suffering from ulnar entrapment for several years prior to his work accident, he would continue to have an entrapped nerve and a nonfunctional hand. Also, as the WCJ pointed out, Dr. Buterbaugh had the first-hand benefit and expertise of being Claimant's surgeon during his elbow surgery and, arguably, has a decent understanding of the situation at hand.

With respect to Claimant's right hip, Dr. Rydze opined that it was related to his accident as it was a new issue post-accident. On cross-examination, Dr. Rydze acknowledged that Claimant had a previous hip injury; however, "answers given in cross-examination do no, as a matter of law, destroy the effectiveness of a previous opinion expressed by a physician." *Hannigan v. Workmen's Compensation Appeal Board (Asplundh Tree Expert Company)*, 616 A.2d 764, 767 (Pa. Cmwlth. 1992), *appeal denied*, 634 A.2d 1118 (Pa. 1993). Instead, the evidence must be assessed as a whole in determining the weight to be given to the opinion. *Id.* Dr. Rydze never recanted his previous testimony nor otherwise suggested that his opinion that Claimant's hip contusion was related to his work accident was inaccurate.

15

## C.

Employer next contends that the WCJ erred as a matter of law in finding that Claimant's medical evidence was competent to support an award given that Claimant's medical experts had an inaccurate history of the claim and Claimant's pre-injury medical conditions. Employer argues that the testimony of Dr. Rydze and Dr. Buterbaugh cannot support a finding of a work-related left elbow injury because they were unaware of Claimant's previous diagnosis of ulnar neuropathy. Furthermore, Employer argues that Dr. Rydze's testimony cannot support a finding of a hip injury for the same reason.

This Court has explained that "[t]he fact that a medical expert does not have all of a claimant's medical records goes to the weight given the expert's testimony, not its competency." *Samson Paper Company & Fidelity Engraving v. Workers' Compensation Appeal Board (Digiannantonio)*, 834 A.2d 1221, 1224 (Pa. Cmwlth. 2003). In making its argument, Employer repeatedly relies on Dr. Agnew's opinions; however, as mentioned multiple times above, the WCJ chose to credit Claimant and his medical witnesses' testimony over Employers' witnesses' testimony.

In any case, Claimant's medical witnesses only offered their opinions, which were consistent with each other, after performing thorough examinations and seeing Claimant multiple times. Dr. Rydze, as Claimant's long time physician, certainly has some knowledge as to Claimant's medical history. Dr. Buterbaugh also took Claimant's medical history when he saw him after the accident, and the WCJ found this to be consistent with Claimant's credible testimony. Moreover, Dr.

16

Buterbaugh acknowledged that he had not reviewed Claimant's medical history and yet did not retract or change his opinions. There is nothing to suggest that the opinions of Dr. Rydze and Dr. Buterbaugh are baseless.

**D.**

Finally, Employer alleges that the WCJ failed to issue a reasoned decision as required by Section 422(a) of the Act[7] because she did not adequately explain why she rejected Dr. Agnew's opinions and then fully ignored his second report.

Although Section 422(a) provides that parties to a workers' compensation proceeding are entitled to a reasoned decision, it does not allow for a party to challenge or second-guess the WCJ's reasons for credibility determinations.

---

[7] Section 422(a) of the Act provides the criteria for a reasoned decision:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached. The workers' compensation judge shall specify the evidence upon which the workers' compensation judge relies and state the reasons for accepting it in conformity with this section. When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the workers' compensation judge must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

77 P.S. §834.

*Dorsey v. Workers' Compensation Appeal Board (Crossing Construction Co.)*, 893 A.2d 191, 195 (Pa. Cmwlth. 2006), *appeal denied*, 916 A.2d 635 (Pa. 2007). Section 422(a) does not require the WCJ to discuss all of the evidence presented or give a line-by-line analysis of each statement by each witness, explaining how a particular statement affected the ultimate decision. *Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043, 1052 (Pa. Cmwlth. 2003). The WCJ is only required to make the findings necessary to resolve the issues raised by the evidence and relevant to the decision. *Id.* A decision is reasoned "if it allows for adequate review by the appellate courts under applicable review standards." *Id.*

In Finding of Fact #7, the WCJ explained that Dr. Rydze has been treating Claimant since 1990 and went on to establish his continuing professional relationship with Claimant, his diagnoses and his opinions, reasoning that Dr. Rydze is credible as his testimony is consistent with Claimant's credible testimony and Dr. Buterbaugh's credible testimony. In Finding of Fact #8, the WCJ established that Dr. Buterbaugh conducted a thorough examination and treatment of Claimant, finding his testimony credible. In Finding of Fact #9, the WCJ explained Dr. Agnew's findings, making sure to mention that he was unable to attribute Claimant's left shoulder injury to the accident. Finally, in Finding of Fact #10, the WCJ explained that insofar as Dr. Agnew's opinion differs from that of Dr. Rydze and Dr. Buterbaugh, she finds the latter more credible because their testimony is consistent with Claimant's credible testimony, combined with Dr. Buterbaugh's presence at the actual surgery. The WCJ also mentioned in Finding of Fact #12 that she is making her decision "[b]ased on *all* the evidence of record," indicating that she did, indeed, consider Dr. Agnew's second report despite her not mentioning it specifically in her decision.

18

On review, the WCJ's findings are adequately supported by substantial evidence so they will not be disturbed on appeal. Furthermore, having set forth the relevant findings and explaining the reasons that she found the foregoing findings to be credible, the WCJ has permitted appropriate appellate review and has provided a reasoned decision as required by Section 422(a). There is no need to disturb the WCJ's findings simply because she did not include information about Dr. Agnew's second report, especially considering the fact that she credited Claimant and his medical witnesses over him, rendering the second report inconsequential.

Accordingly, we affirm the Board's order upholding the WCJ's grant of Claimant's claim petition and denial of Employer's termination petition.

_____
DAN PELLEGRINI, President Judge

19

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Yellow Transportation,           :
                    Petitioner   :
                                 :
          v.                     : No. 1227 C.D. 2015
                                 :
Workers' Compensation Appeal     :
Board (Shatkoff),                :
                    Respondent   :

# **O R D E R**

AND NOW, this 5<u>th</u> day of <u>January</u>, 2016, the order of the Workers'
Compensation Appeal Board dated June 16, 2015, at No. A13-1363, is affirmed.


_____
DAN PELLEGRINI, President Judge